WABASH, ST. L. & P. RY. Co. *v.* CENTRAL TRUST Co. OF NEW YORK and others.

CENTRAL TRUST Co. OF NEW YORK and another *v.* WABASH, ST. L. & P. RY. Co.

*(Circuit Court, N. D. Ohio, W. D.* June Term, 1884.)

1. RAILROAD MORTGAGES—FORECLOSURE—"POOLING" SECURITIES.
   Creditors secured by the same mortgage and placed upon the same footing have a common interest in the security, and combinations for their common protection may be formed and executed; but there is no community, but a repugnance, of interests between parties claiming under many different mortgages, and the court will not pass a decree foreclosing all the securities and ordering a sale of the property as an entirety.

2. SAME—NECESSARY PARTIES.
   Prior mortgagees are not, as a general rule, necessary parties to a suit to foreclose a prior mortgage.

Original, Cross, and Amended Bills.
*Wager Swayne,* for complainant.
*Butler, Stillman & Hubbard,* for Trust Company.

BAXTER, J. The bill of the Wabash, St. Louis & Pacific Railway Company, filed in this court, is ancillary to and in aid of a bill filed by it on the twenty-seventh of May, 1884, in the circuit court of the United States for the Eastern district of Missouri. From the allegations thereof it appears that the complainant was, at the commencement of the suit to which this is ancillary, the owner of a number of railroads denominated "The Wabash System," extending across the states of Missouri, Illinois, and Indiana, and into the states of Ohio, Michigan, and Iowa, constructed by other corporations created for the purpose, and which were, before complainant's acquisition of title thereto, severally incumbered with one or more mortgages made to secure the payment of large amounts of bonds issued by said respective corporations; and the bonds so issued and secured, or most of them, are now outstanding and unpaid in the hands of *bona fide* holders. After complainant's acquisition of title to said roads, to-wit, June 1, 1880, it executed what is termed the "general mortgage," in and by which it conveyed its franchise, roads, and other appurtenant property to the Central Trust Company, of New York, and James Cheney, of Indiana, to secure $50,000,000 of bonds which it proposed to issue. But by the express terms of said instrument it was made

"subject and inferior to all such prior liens as were charged upon the several portions of said roads and the equipments thereof, and to such estate and liens of such specific trusts and mortgages and other obligations as might thereafter be made and charged upon any property which might thereafter be acquired, and which trusts so charged should form part of the purchase money or condition of the acquisition of such after-acquired property." Seventeen million dollars of the bonds authorized and secured by this mortgage were issued, and are now outstanding and unpaid.

On the tenth of April, 1883, this general mortgage was supplemented by a lease of all complainant's roads and property to the St. Louis, Iron Mountain & Southern Railway Company, and, "being greatly in need of money to meet accruing interest and place its lines of roads in good condition, and to pay for a large amount of rolling stock and other necessary equipment, and to complete certain of said lines then being constructed," the complainant, on May 1, 1883, entered into another indenture with the Mercantile Trust Company, of New York, known as "the collateral mortgage," by which it "assigned to said trust company a large number of engines and cars; and also a large number of bonds, stocks, and other certificates; and also certain equitable interests in valuable depots, grounds, and other terminal facilities" owned by it in the cities of Chicago and Peoria, Illinois, Detroit, Michigan, and Des Moines, Iowa. Five million six hundred and seventy-one thousand dollars of the bonds authorized and secured by this mortgage have been issued and negotiated, and are now outstanding valid obligations against the complainant. And on December 21, 1883, the complainant made another mortgage of its said roads and property, rents, issues, and profits, etc., to secure the payment of all advances which the mortgagee therein named had or might thereafter make to it, under and pursuant to the provisions of said lease of April 10, 1883, hereinbefore mentioned.

After thus enumerating the incumbrances resting upon its property, the complainant proceeds with painful minuteness to detail its unavailing struggles with adverse fortune. For several successive years it was compelled to expend "vast sums" in repairing injuries inflicted on its lines by extensive freshets. Its tracks, embankments, bridges, and culverts were, in numerous instances, wholly swept away and destroyed. A partial failure of crops along and near its lines for the past two years, and particularly in "those fertile portions of the country from which it derived its largest revenues," and from which "it had fairly and reasonably expected a profitable business," greatly diminished its earnings. To meet the expenses of maintaining and operating its roads, and completing its system and putting it in operation, complainant was compelled to borrow large sums of money. Considerable portions of the sums thus obtained were advanced by the St. Louis, Iron Mountain & Southern Railway Company. But this company is under no obligations to make any further loans, and has

notified complainant that further advances will not be made by it. In this extremity the complainant, yielding to the necessities of its condition, made promissory notes to the amount of $2,200,000, and induced a number of persons of high financial standing to indorse them. These notes were about to mature, and the complainant is without the means to pay them. It was furthermore indebted to the St. Louis, Iron Mountain & Southern Railway Company, for advances made by it, the sum of $1,150,091.30, and interest accrued thereon, and also large sums to a "multitude of laborers who have little to live upon other than the fruits of their daily labor," the amount of which it cannot state. If the sums so due, are not paid, or secured "by the action of a court of equity, by preventing the disruption of complainant's said property and the wasting of its assets," great and wide-spread suffering will ensue to said laborers, and irreparable injury be thereby produced. And by reason of the failure of crops, the enormous expense incurred in repairing injuries occasioned by extreme freshets, and in completing its lines, it has contracted a floating indebtedness of $4,784,155. The creditors to whom the same is due are threatening, if payments are not made, to resort to every method provided by law for the collection of their demands. It is also largely indebted to connecting lines for balances due them on an exchange of business, which, if not paid, will cause said companies, or many of them, to withdraw their business, and in this way force a further reduction of its income. And, while thus pressed by creditors for the amounts so due them, the beneficiaries of the several mortgages upon the property when the complainant acquired it are insisting upon the enforcement of their rights in the premises,—said mortgages, or most of them, embracing rolling stock to be thereafter acquired by the several corporations executing them; but as these separate lines of road have been gradually absorbed in complainant's said system, the rolling stock has become so intermingled as to be incapable of division according to the original ownership of said several mortgages, and any attempt to control or dispose of portions of such rolling stock by a court or courts not having jurisdiction of the whole, and not competent to deal with complainant's entire property as a unit, would produce great confusion and uncertainty, resulting in great loss to all persons interested in said rolling stock, or in complainant's property or securities. The directors and other officers of complainant have "resorted to all proper measures for obtaining the means with which to pay its floating debt, and also to meet the large amounts of accruing interest;" but they have wholly failed, and, for the time being, it is "practically insolvent." And in despite of all these exertions the complainant was, at the time of commencing its suit, certain that a default in the payment of the interest to mature on the first of June would occur, and the complainant will also be without the means of meeting its floating indebtedness.

Several of said leasehold interests are of "extreme importance," as

some of the lines so leased form valuable links in the chain of complainant's lines by means of which it is enabled to reach some points from which it derives a part of its most valuable business. But under the terms of said leases, the lessors are authorized to declare a forfeiture thereof, unless the rentals stipulated for therein are promptly paid as they mature; and complainant avers, that unless some provision is made by which such rentals as may shortly mature can be promptly met, its leasehold interests, or some of them, will be declared forfeited and wholly lost, and its lines and power of earning money will thereby be very seriously affected. A large portion of the rolling stock in complainant's use and necessary to its business is held under conditional contracts of purchase and not paid for, and it is liable to lose the same, and forfeit the amounts already paid thereon, if a default is made as to future payments of the purchase money contracted to be paid therefor as the same become due. As soon as default shall be made in the payment of bonded interest to mature in June, (past,) a large number of suits will be commenced at law in numerous state courts along the lines of complainant's roads, and its supplies, materials, rolling stock, and other personal property will be seized under execution and attachments, and complainant will be thereby deprived of the means necessary to the operation of said roads; that the results will be ruinous to complainant's prospects "with reference to earning a revenue, and more particularly disastrous because the present promise of an excellent crop in the west offers strong hopes that a large revenue will be earned by complainant in the near future." But if complainant's rolling stock, materials, and supplies "be seized under executions and attachments, (as they undoubtedly will be, unless protected by the action of the court,") the benefit of moving the growing crops, and the large revenue to be fairly hoped for as arising from such traffic, will be lost, not only to complainant, but to all persons interested in complainant's railroad property. And, unless the complainant is protected by the court, as soon as the anticipated default aforesaid in the payment of interest shall occur, a number of suits will be commenced in the state or federal courts, held near the complainant's lines of railroads, for the appointment of receivers under the original sectional mortgages executed by the several corporations on portions of complainant's lines before the complainant acquired the same. In that event the complainant's system will be broken into fragments, its unity destroyed, and its revenue reduced, and in all probability its roads will be sold in sections, making it impossible to re-establish the unity thereof now existing.

To this bill the Central Trust Company of New York and James Cheney, trustees of the general mortgage, have appeared, answered, and filed their original and ancillary cross-bills,—the first in the United States circuit court for the Eastern district of Missouri, and the latter in this court,—in which, after substantially recapitulating the allegations of the original bill, they allege a default in the pay-

ment of the June interest secured by said mortgage. The original complainant thereupon filed its amended bill of 174 printed pages. But it does not by said amendment introduce any new element into the case. The amended bill is but an amplification of the original. Its purpose is to inform the court more fully and specifically of the complainant's condition, disclose the nature and extent of the incumbrances upon its property, and the relations which they bear to each other; make new parties, and define their respective interests in the subject-matter of this litigation. All of these bills, original, ancillary, and amended, contemplate the ascertainment of the claims, rights, and equities of every person interested under any of said incumbrances, and a foreclosure of all of them by sale of the several mortgaged premises in its entirety, and a distribution of the proceeds to arise therefrom among the numerous beneficiaries in proportion to their several interests.

Are the complainants, or either of them, entitled to the relief demanded, or any part of it? Assuming the facts alleged to be true, no relief, other than that which has been already accorded, can be granted on the original bill. This bill has accomplished the objects contemplated by it. It has secured the appointment of a receiver, and kept the way open for the interposition of the cross-complainants; and, having accomplished this much, it is no longer a material factor in the case, and may be hence dismissed from further consideration. But the cross-complainants cannot be so summarily disposed of. As trustees of the general mortgage, it became their duty, upon default in the payment of the interest as the same matured thereon, to foreclose it. This is the object of their cross-bill. If this was the whole scope of their demand, there would be no necessity for any action by the court at this time. But these complainants insist that, as an incident to the foreclosure of the general mortgage, they have the right to foreclose the 42 other and prior mortgages referred to in the pleadings. But this, we conceive, is a misconception of the equities and necessities of the case. Cases have and may again arise in which property covered by different incumbrances may be properly sold as an entirety, and the claims of the different beneficiaries thereof thereafter adjusted upon the fund realized from such sale. But this is not such a case. The rights of the different sets of creditors, secured by said mortgages, are entirely distinct. Those claiming under the mortgage upon the road extending from Toledo to the state of Indiana have no interest in either of the other mortgages sought to be foreclosed by this suit, and *vice versa*. Their remedies are as distinct as their rights. Each set of beneficiaries is entitled to a separate foreclosure of the security under which they respectively claim, and to separate sale of the property embraced therein. Their right to such separate remedy and separate sale is a vested and valuable right, that can neither be abrogated nor materially impaired without their consent. When property included in the same mortgage is thus sold,

the beneficiaries thereof can, if the exigencies of the case require it, protect their security "without involving themselves in onerous engagements, or subjecting themselves to onerous conditions." 2 Wood, 269. Such concerted action of creditors is frequently the only means whereby they can protect themselves, and make their securities available in the payment of their just demands.

But this valuable protective power would be practically destroyed by an application of the complainant's theory to the facts of this case. Their proposition, as we have already seen, is to "pool" the 42 different mortgages mentioned in their bills, and sell the property therein embraced as an entirety. This would be a convenient method of disincumbering it, and transferring the title thereof to a purchaser freed from existing liens and complications. But it would effectually forestall everything like co-operative action on the part of the beneficiaries for whom the sale is to be made. Creditors secured by the same mortgage, and placed upon the same footing, have a common interest in the security. Their rights are the same. Whatever benefits one, necessarily inures to the advantage of all the others, and hence combinations for their common protection are easily formed and readily executed. But there is no such community of interest between complainants under different mortgages. On the contrary, their interests are necessarily repugnant to each other. Suppose the court was to adopt complainant's theory, and enter a decree, either upon the original or upon the cross-bill, foreclosing all the securities involved, and order a sale of the property embraced therein as an entirety; could the beneficiaries of these several securities probably agree upon a basis of co-operation to prevent its being sold for less than its value, or for less than the amounts due them? The court has no power to fix a basis for their common action and compel them to conform to its dictation; this can only be attained through and by means of a mutual agreement of the parties interested. And is it not obvious that no such amicable agreement could be consummated in this case? The labor of finding all the beneficiaries of all the mortgages, and inducing them to enter into such a negotiation, would be immense, and, if undertaken, would most likely fail of accomplishment. But we will suppose that they were all found, and brought together, either personally or through their authorized representatives. Is it at all probable that a satisfactory agreement could be formulated for adoption? By whom and upon what basis could the interests of each beneficiary be definitely ascertained and authoritatively declared? The relative value of the distinct properties embraced in each mortgage would, of necessity, have to be agreed on; and yet each set of mortgagees would be interested in enhancing the value of their respective securities and depreciating the others; and when the difficulties incident to such diversity of pecuniary interests is considered in connection with the number of claimants, the acknowledged selfishness of men, and the imperfections of human judg-

ment, it becomes apparent that concerted action on the part of all the creditors to prevent a sacrifice of their otherwise valuable securities would be practically impossible, without which they would be irretrievably in the power of any syndicate of capitalists that might be organized to buy the property, and the amount realized therefrom, or a large part thereof, would be wasted in efforts to ascertain the proper basis for its distribution. Such complications and injustice ought, if practicable, to be avoided. The cross-complainant is entitled, upon the facts alleged, to foreclose the general mortgage under which it claims; but it can do this without bringing prior mortgagees before the court, (*Jerome* v. *McCarter,* 94 U. S. 734,) and a sale made pursuant to a decree rendered in the absence of such prior incumbrancers would vest the purchaser with the title possessed by the mortgagee; that is, the purchaser under foreclosure decree in this case will take the mortgage estate subject to all outstanding valid liens, and prior incumbrancers will be left to pursue such remedies to enforce their respective rights as they may severally elect to adopt. There are about 90 prior mortgagees made defendants to this suit. They ought not be put to the expense of making a defense. The court, therefore, on its own motion, orders that the original and cross-bills be dismissed as to all prior mortgagees made defendants herein, with costs; but the cause will be retained as to all other parties for such further action as the parties may from time to time show themselves entitled to demand.

Other reasons might be urged in support of the decree authorized, but those given will suffice to vindicate the action of the court.