LINCOLN PRINTING CO. v. MIDDLE
WEST UTILITIES CO. (POLLAK,
Intervener).
No. 11654.

District Court, N. D. Illinois, E. D.
April 26, 1934.

Mayer, Meyer, Austrian & Platt, of Chicago, Ill., for Continental Illinois Nat. Bank & Trust Co. of Chicago.

Samuel A. & Leonard B. Ettelson, of Chicago, Ill., for Pollak.

Cutting, Moore & Sidley, of Chicago, Ill., for preferred stockholders' committee.

Burry, Johnstone, Peters & Dixon and Schuyler, Weinfeld & Hennessy, all of Chicago, Ill., for Charles A. McCulloch.

Ryan, Condon & Livingston, of Chicago, Ill., for Edward N. Hurley Estate.

Kirkland, Fleming, Green & Martin, of Chicago, Ill., for noteholders' committee.

Hopkins, Sutter, Halls & DeWolfe, of Chicago, Ill., for First Nat. Bank of Chicago.

Jacobson, Merrick, Nierman & Silbert, of Chicago, Ill., for petitioning creditors in bankruptcy.

Taylor, Miller, Busch & Boyden, of Chicago, Ill., for stockholders' committee.

LINDLEY, District Judge.

On January 10, 1934, this court announced that for reasons then stated a hearing should be had promptly to determine whether the appointment of receivers for Middle West Utilities Company, hereinafter termed Middle West, was the result of collusion and fraud upon the court.

Middle West was one of the group of so-called Insull corporations which included among others two investment trusts, Insull Utility Investments, Inc., and Corporation Securities Company.

On April 16, 1932, Calvin Fentress was appointed receiver for Insull Utility Investments, Inc., and, later, ancillary receiver in New York, and subsequently receiver in bankruptcy. Petition for compensation for services as receiver of Insull Utility Investments, Inc., by Calvin Fentress and petitions for compensation for legal services rendered to said receiver having been filed, the same were heard by the Hon. Evan A. Evans, one of the judges of the Circuit Court of Appeals of this circuit sitting in this court (6 F. Supp. 653). In the opinion filed in said proceedings Judge Evans said: "It is quite impossible to separate the application for the appointment of a receiver in the Insull Utility Investments, Inc., from like applications in Middle West and Corporation Securities Companies. Three companies were organized and promoted by the so-called Insull interests. They all revolved about the activities of one Samuel Insull, Sr. One company, the Middle West, was a holding company, and the other two are investment trusts."

After reviewing the evidence submitted before him, Judge Evans said, as to Insull Utilities Investment, Inc.: "Upon this showing, and bearing in mind that the suit was one for the appointment of a receiver, a finding that the suit was collusively brought is unavoidable."

The value of Mr. Fentress' services as receiver in the equity case and in the ancillary proceedings and as receiver in bankruptcy was fixed at $12,500, which sum he had already been paid. Further allowance of fees to him, therefore, was denied. Proper allowance of compensation to each of the two law firms representing said receiver was fixed at $12,500, which had already been paid to them. Allowance of further or additional fees as counsel for said receiver, therefore, was denied.

It was because of the language of the opinion of Judge Evans in the case referred to that I deemed it incumbent upon this court to initiate and conduct this inquiry. Rightly or wrongly I regarded that opinion as containing an implication of fraud upon the court in procuring the appointment of receivers for Middle West, and announced that, independent of any action by any party litigant, it is always the duty of a court, the moment a substantial suggestion of fraud comes to it, upon its own motion, to institute an inquiry into all the facts; and that in the present case the court had formed the conviction that, whether or not any interested party should so request, it should, sitting in

chancery, cause to be initiated proceedings looking to a complete investigation and final adjudication of the question of whether this court has been the victim of a fraud perpetrated upon it.

The receiver, Charles A. McCulloch, has also filed a petition setting forth in some detail the history of his appointment as receiver, subsequent developments and accomplished results of the receivership. Therein he said, "If there is a cloud on petitioner's title as receiver he desires it removed," and prayed that a rule be entered upon all interested parties to answer and set forth grounds of objection, if any, which they might have to his continuance as receiver, and that full investigation be made and his appointment confirmed.

The court granted leave also to Sidney B. Pollak to file an intervening petition, wherein it was alleged that he is the owner of 2,-200 shares of common stock of Middle West; that the receivership proceedings had been fraudulently instituted and were and are a fraud and imposition upon the court; that, prior to the time receivers were appointed, certain secret meetings had been held, attended by Samuel Insull, his personal counsel and executives of certain creditor banks, for the purpose of formulating a specific plan and procedure for placing Middle West and certain other so-called Insull Corporations in receivership; that at said meetings Samuel Insull, Edward N. Hurley, and Charles A. McCulloch were collusively selected to be suggested as receivers and the two law firms appointed as counsel for the receivers were likewise collusively selected; that no debenture holders, unsecured creditors, or stockholders were represented; and that said meetings were held, and the selections of nominees made, solely in the interest of Samuel Insull and the secured bank creditors, who, it was alleged, were interested in protecting for themselves certain collateral placed by Insull with them to secure loans procured by him in his prior unlawful management of the corporation.

This petition also charged that full and fair disclosure was not made to the court of the meetings or of what there occurred, as to how or by whom the recommendations had been agreed upon; that about the same time a petition in bankruptcy was filed in this court against the company and is still pending; that the selection of receivers and solicitors was in violation of the practice approved by the Supreme Court; and that the receivers herein and their attorneys and solicitors are, as a result disqualified and their appointments illegal and void.

The relief prayed in the petition is in the alternative: That the bill of complaint and all proceedings herein be forthwith dismissed; or that the orders appointing the receivers and their counsel be vacated, and that this court select and appoint a receiver and counsel therefor; that, upon such dismissal, the receiver and his solicitors be required to return to the estate all moneys received by them on account of fees; that an order be entered requiring the filing of a claim against the estate of Edward N. Hurley, now deceased, for the amount by him received as fees as receiver; and that, if the estate has suffered any loss through the payment of unlawful expense on account of the receivership, the same be paid by counsel who were responsible for the imposition of the alleged fraud.

A rule was entered upon all parties in interest to answer both the petition of the receiver and that of the intervening petitioner, and various answers of interested parties were filed.

The court stated its determination to have developed every fact and circumstance tending to shed light upon the subject-matter of the inquiry, and appointed counsel entirely disinterested in the result of the inquiry, and wholly disassociated with any of the various interests involved, to appear, advise, and assist in the conduct of the hearing to the end that the court might be fully and completely advised upon all issues bearing upon the suggestion of fraud upon the court and upon the ultimate basic and most important question of what is for the best interests of the trust estate.

Mr. Pollak filed his formal answer to the receiver's petition, and appended thereto as an exhibit a copy of an intervening petition presented to the court by him on June 7, 1932, with a motion for leave to file the same. This motion was denied on or about August 12, 1932.

Since in the answers filed by other interested parties and at the hearing reference was made to this Pollak intervening petition previously presented, some consideration of the character thereof is appropriate.

In this previous petition Sidney B. Pollak alleged that he was the owner of 2,800 shares of common stock of Middle West, and, upon information and belief, that there were outstanding 15,641,983 shares of said common stock. He recited the filing of the bill

herein, the hearing had pursuant thereto, and the entry of the order appointing Samuel Insull, Edward N. Hurley, and Charles A. McCulloch receivers. He alleged that the law firms of Burry, Johnstone, Peters & Dixon and Schuyler, Dunbar & Weinfeld had been appointed and were acting as solicitors for the receivers; that the proceeding was a consent receivership procured by Middle West and engineered by Samuel Insull, and that the latter had exercised a dominating and controlling power in the company, and was continuing to dominate and control the policies and financial transactions of the company and affiliated corporations.

This previous intervening petition also charged that Samuel Insull had been guilty of gross misconduct, prior to receivership, in the conduct of the business of said company, to the great financial injury of and loss to the stockholders, and to the wreck and ruin of the company.

In this prior petition Sidney B. Pollak prayed that he be admitted as an intervener to protect his rights as the owner of common stock; that the order appointing receivers be modified by vacating the appointment of said Insull and appointing some disinterested and qualified person in his stead; and that the order appointing solicitors for the receivers be modified by vacating the appointment of Schuyler, Dunbar and Weinfeld and appointing some disinterested qualified law firm in their stead. There was no request for the removal of Edward N. Hurley or Charles A. McCulloch as receivers or of the firm of Burry, Johnstone, Peters & Dixon as solicitors.

It is urged in certain of the answers filed to the present Pollak petition that said petitioner is, by the presentation of his said former intervening petition, and by his failure then and therein to advise the court of any ground of objection to Messrs. Hurley and McCulloch or to Burry, Johnstone, Peters and Dixon, and by tacitly acquiescing in their administration for a period of almost two years, now estopped to assert any charge of fraud or collusion against any party other than Samuel Insull or to claim that the banks were guilty of fraud in procuring the appointment of the other receivers, and that he cannot be now heard to assert charges of fraud which were not revealed in his previous petition. However, in view of the scope of the present inquiry initiated upon its own motion, the court makes no finding upon these questions of estoppel.

The record shows that Samuel Insull

within a few weeks after his appointment was compelled to and did tender his resignation as receiver, which was promptly accepted, that Edward N. Hurley is now deceased, and that Charles A. McCulloch is acting as sole receiver herein.

This inquiry came on for hearing before the court on February 6, 1934, and was concluded sixteen days later. The transcript of the testimony in the record comprises nearly two thousand typewritten pages, in addition to exhibits identified and introduced in evidence. Full proof was made of the various acts and transactions leading up to the filing of the bill, the proceedings in court on the day of the appointment, and of the history and accomplishments of the receivership to the date the hearing herein was concluded. Those present and represented by counsel who have participated in this inquiry include: Counsel appointed by the court; the receiver, Charles A. McCulloch; the executor of the Estate of Edward N. Hurley, deceased; Sidney B. Pollak, a stockholder of Middle West; Lincoln Printing Company, plaintiff; the committee representing the holders of the $40,000,000 of unsecured notes of Middle West; the committee representing the preferred stockholders; the committee representing the common stockholders; the Continental Illinois National Bank & Trust Company of Chicago; the First National Bank & Trust Company of Chicago; and petitioners for involuntary adjudication in bankruptcy against Middle West.

With the exception of counsel representing the petitioner Mr. Pollak and counsel appointed by the court, all of the solicitors have persistently urged throughout the inquiry that no fraud was committed upon the court. All have filed briefs and arguments supporting their position and insisting that, independent of that question, the conduct of the receivership has been constructive and advantageous to the property and to the beneficiaries of the trust, and that this, a court of equity, should decline to interfere with the administration by the surviving receiver, Charles A. McCulloch, but should approve the same and continue it as desirable for the best interests of all concerned. On the other hand, counsel for Mr. Pollak contended throughout the inquiry and by extensive brief and argument that the receivership was conceived with a fraudulent purpose in the interest of Samuel Insull and the banks.

All counsel have co-operated with counsel appointed by the court to develop of record in this hearing evidence of all facts bear-

ing upon the subject-matter of the inquiry. The record contains a full and complete recital not only of all known pertinent evidence, but also voluminous excerpts from the records and files of this receivership proceeding.

The record discloses that during the month of December, 1931, there prevailed in business generally throughout the country, and especially in the banking business of the nation, a state of general economic unrest and uneasiness. The continually deepening financial depression had at that time brought about a condition in the affairs of Middle West which was then fast becoming a matter of grave concern to those having intimate knowledge of prevailing conditions. The company owed the First National Bank of Chicago something over $5,000,000, the Continental Illinois National Bank & Trust Company approximately a like amount, and the Central Republic Bank & Trust Company nearly $2,000,000. It owed various banks in New York City more than $10,000,000, and lesser amounts to other banks; its aggregate bank indebtedness being approximately $26,000,000. The late Mr. Melvin A. Traylor, then president of the First National of Chicago, in December directed Mr. Edward E. Brown, then an executive vice president of that bank, to take charge of all the bank's loans to companies in which Samuel Insull was considered the dominant factor and to give special attention to the subject-matter of security for these loans.

The affairs of Middle West were interwoven and interrelated with Corporation Securities Company and Insull Utility Investments, Inc., two investment trusts, controlled and dominated by Samuel Insull; and these trusts were also heavily indebted to the banks in New York and Chicago. About the 1st of January, 1932, frequent conferences were held by the representatives of the banks in Chicago and New York concerning the affairs of the corporations controlled by Samuel Insull. Request was made by the banks for the deposit by the debtor corporations of additional collateral to secure existing loans. There was much discussion with Samuel Insull concerning his ability to secure additional credit and avoid a collapse.

Then pending in Congress was the Reconstruction Finance Corporation Act (15 USCA §§ 601–617), through the medium of which it was hoped corporations in need of additional credit could be financed and the banks relieved of some of their burden. However, the act, when finally adopted, was so framed that it was not believed it could extend credit directly to such corporations as those now under consideration. This information added to the concern and alarm of the investment interests of the country. Especially in New York and Chicago were they deeply concerned as to the possibility of such organizations weathering the storm. Conditions then, the witnesses before the court in this inquiry stated, were about as discouraging as they could be.

At this juncture the creditor banks in Chicago agreed to enter into what they term a "standstill" agreement, by the terms of which they would refrain from foreclosing on their collateral and from pressing for payment on their loans, provided all creditor banks would agree and thus relieve the Insull companies from the pressure of reducing loans or furnishing additional collateral.

Although this "standstill" agreement was not actually signed by all of the creditor banks, the spirit of the agreement was respected by all and the companies were not thereafter subjected to demands for reduction of the loans or for additional collateral.

Samuel Insull had for a long time been closely associated with Owen D. Young, chairman of the Board of the General Electric Company and deputy governor of the Federal Reserve Bank of New York, who was a man of recognized authority and standing in financial circles and national affairs. Mr. Young came to Chicago and discussed the situation with the officials of Middle West and with the Chicago bankers, and co-operated with them in a common attempt to avoid a collapse of the Insull financial situation and consequent injury, not only to its creditors and stockholders, but to the country as a whole.

During the months of January and February, 1932, through the co-operation of the banks, the affairs of Middle West remained in status quo. But throughout that period there was great uneasiness because of the possible inability to carry on through the depression and avoid the disaster which would follow a financial wreck of what we may term the Middle West empire. This far-flung organization extended from New England to Texas and from the Dominion of Canada to the Gulf of Mexico, through the control and operation of hundreds of subsidiary companies, including not only public utilities but various industrial corporations.

On the 29th of February, 1932, a plan was evolved by which Arthur Andersen & Co., a well-known auditing firm of Chicago, was employed to represent the interests of the New York banks in conjunction with the officials of the Chicago banks in connection with the affairs of the Middle West and other affiliated Insull corporations. Thereby it became this firm's duty to prevent any diversion of funds or assets from any one of the Insull companies to another and to cooperate with Mr. Brown of the First National in Chicago and Mr. Stilwell of the Continental-Illinois in that city, the three of them to form a committee to pass upon expenditures for any important purpose.

Mr. Andersen proceeded to set up an organization and installed a plan of voucher control, by the terms of which, as to all major expenditures, all vouchers should be first approved by him or his representative before expenditures or payments were made.

During the month of March, 1932, through the medium of this supervision by Andersen & Co., it developed that large cash expenditures would be required to meet the requirements of Middle West to keep it from default, and that such cash could be secured only by additional borrowings. Andersen's conclusions to this effect were disputed by Samuel Insull, but the latter was finally forced to admit that approximately $3,000,-000 cash would be required in addition to that which might be anticipated as receipts in the course of business, to meet obligations which would mature and have to be met by the 1st of June, 1932. In addition, the company was confronted with a $10,000,000 maturity on June 1, 1932, part of its outstanding $40,000,000 note issue. Strenuous effort was made by the banks to justify additional loans to meet the necessities of the company, and also in some manner to refund or extend the $10,000,000 in notes maturing June 1st.

Andersen & Co. had also come to the conclusion, and finally secured acceptance of its figures, that at least $8,000,000, in addition to the $10,000,000 required to refund the maturing notes, would have to be provided during the year 1932 to enable Middle West to carry on its business.

Because Samuel Insull was disputing the accuracy of Andersen's calculations of cash necessities above cash receipts, a conference took place in New York City in the week of the 4th of April, 1932, in the office of Owen D. Young. It was attended by Samuel Insull, Sr., Samuel Insull, Jr., Harry G. Stuart, of the firm of Halsey, Stuart & Co., who had been large distributors of the $40,-000,000 of outstanding notes of Middle West Utilities Company, certain New York bankers, Edward E. Brown of the First National, A. J. Stilwell of the Continental Illinois of Chicago, W. C. Freeman and Carroll Gray of the Central Republic of Chicago, Arthur Andersen and Owen D. Young. Preliminary to this conference, Mr. Insull, who had preceded the other Chicago conferees to New York, had labored with Arthur Andersen to convince him of error in his conclusions as to the anticipated cash requirements of the company.

Before Mr. Brown left for New York, the First National had by formal action of its executive committee authorized him, as its representative, to contribute as much as $150,000 toward an aggregate loan of $2,-500,000 or $3,000,000 to the Middle West Utilities Company, if it could be shown that a loan in that amount would be sufficient to meet its requirements and save the situation. Like authority had been given Mr. Stilwell by the Continental Illinois, if a pool could be formed which would furnish funds sufficient to meet the necessities. Neither the First National nor the Continental asked any security for any such advancement, but insisted that, if an aggregate fund were provided by the banks to loan to the Middle West Company, such loan should be made without requiring collateral. Indeed, the Continental had given Mr. Stilwell authority, if necessary, to make an outright contribution of the amount of its share of the aggregate total to be advanced in order to prevent a collapse of Middle West. This action upon the part of the banks was inspired, according to the testimony, by the belief that such an unsecured loan was warranted, if thereby the dire catastrophe of failure of the Insull holding companies and investment trusts could be averted and the consequent effect upon the nation as a whole avoided.

At the meeting in New York Mr. Young presided. After some preliminary discussion, he retired to another room for conference with the bankers, in the absence of Samuel Insull. He returned to the general conference with the information that the New York banks were unwilling to make further advances without adequate security.

Mr. Insull then inquired of Mr. Young "if this meant receivership," and was told that "it probably did," whereupon the evidence is, Samuel Insull accepted the inev-

itable and admitted that it was necessary, in order to conserve the property of the company, to have instituted suits asking for the appointment of receivers for the Middle West and the two investment trusts already mentioned.

Thereupon the New York bankers suggested that the representatives of the Chicago banks return to Chicago, as the matter would have to be handled there. It was then generally understood by the parties participating that receivership was inevitable, but should be accomplished with as little shock to the financial system of the country as possible.

It appears from the uncontradicted evidence, therefore, that up to that time the banks, especially those in Chicago, had endeavored to find a way and provide means to avoid financial disaster for the Insull companies; but that Mr. Andersen's examination and calculations showed that the catastrophe was inevitable, and that thereupon the interested parties became convinced of the absolute necessity of receivership.

While in New York, Mr. Brown and Mr. Stilwell discussed with Mr. Young and others the names of men who might be available and desirable for selection as receivers in this unusually important situation. It was agreed that it was essential to find men of outstanding reputation and well-known business standing and integrity, willing to be recommended. It was stated that it might be possible to persuade Ex-President Calvin Coolidge to accept appointment, and steps were taken to ascertain whether he would serve.

Samuel Insull and his associates returned from New York, arriving in Chicago on Saturday, April 9th. Messrs. Brown and Stilwell arrived in Chicago on Sunday morning, April 10th, and learned that Samuel Insull had called a meeting at the Chicago Club for Sunday afternoon. Some indignation was expressed by some of the bankers at Samuel Insull's apparent presumption in himself calling this meeting.

However, the parties invited attended the meeting. They included Samuel Insull, Samuel Insull, Jr., Waldo F. Tobey, of the law firm of Isham, Lincoln & Beale, who had long been personal attorneys for Samuel Insull and represented the Middle West and various other Insull controlled corporations, Daniel J. Schuyler, who had in some or many matters represented Samuel Insull, and whose law firm was counsel for Corporation Securities Company, Melvin A. Traylor,

president, and Edward E. Brown, vice president, of the First National, James R. Leavell, president, and A. J. Stilwell and Herman Waldeck, vice presidents, of the Continental-Illinois; Joseph E. Otis, of the Central Republic; H. L. Stuart, of Halsey, Stuart & Co., through whom a large portion or all of $50,000,000 of Middle West Utilities Company notes had been sold, and who was also a heavy creditor, and Mr. Solomon Smith, of the Northern Trust Company of Chicago.

Messrs. Traylor and Brown, on their way to the meeting, discussed the question of how best to avoid permitting Samuel Insull to occupy a dominating or controlling position in the impending receivership, and agreed that they would suggest to the other parties the wisdom of a plan by which the benefit of Insull's knowledge and service could be had initially, but which at the same time would guarantee prevention of his domination of the management of the company after receivers should have been appointed. At the meeting, Mr. Traylor and Mr. Brown were instrumental in persuading the bankers there present from then coming to agreement as to who should be recommended to the court for receivers of Middle West, further than to suggest that there should be three, one of whom should, initially, be Samuel Insull.

The record clearly shows that all parties attending the meeting at the Chicago Club understood that it was called for that place and at that time to avoid publicity. Apparently Samuel Insull presided and reported the result of the New York visit. He advised those present that it had been decided in New York that receivership for Middle West was inevitable, and that he preferred not to be one of the receivers, but desired to be associated officially with the administration, preferably, it was intimated, as general manager. The majority of those present believed that, if he retained some such position of authority under the receivers, he would thereby escape direct responsibility to the court and make it more easily possible for him to dominate than if he were one of three receivers associated with two forceful aggressive men acting as co-receivers.

There was much discussion about who should be recommended for receivers The evidence is that it was stated that the most which could be done was to agree upon recommendations, as the appointment would be made by the court, and none of the parties could assume to dictate whom the court would appoint.

Before leaving New York, arrangements had been made to have the New York bankers ascertain if Calvin Coolidge would accept the appointment, if he were named, and advice in that respect was not received until the following day, when information was telephoned from New York that Mr. Coolidge was not available. A number of names were suggested, and included in them were those of Edward N. Hurley, Charles A. McCulloch, John Hertz, Ex-Governor Frank O. Lowden, E. V. R. Thayer, R. B. Lamont, Garrard Winston, Rufus C. Dawes, Bruce Johnstone, and A. A. Sprague. It was then the consensus of opinion that the court should be asked to appoint three men, one of whom should be Samuel Insull. However, the parties present agreed that they would have further discussion, in the absence of Samuel Insull, in determining who should be recommended to the court as possessing the quality of independence that would prevent domination by Samuel Insull. On the following and succeeding days there were numerous conferences among the bankers, attempting to reach a decision as to whom they could by agreement recommend.

Mr. Hurley was believed to possess peculiar qualifications for this position on account of his long and varied public career, having been chairman of the Federal Trade Commission, chairman of the United States Shipping Board during the war, executive of the Hurley Machine Company, and director of the Chicago Great Western Railroad Company, of the Central Republic Bank, of the Studebaker Corporation, the Illinois Power & Light Corporation, the Chicago City Railways, and numerous other corporations. He was familiar with the management and operation of utilities, and was believed to be a man who would immediately enlist public confidence.

Charles A. McCulloch had been president of the Parmalee Transfer Company, an executive of the Yellow Cab Company organizations, chairman of the Board of John R. Thompson Company, and a director of the First National Bank and other corporations, and was known and recognized as a self-made successful man of independent judgment and driving force. He was intimately acquainted with the business life of Chicago, and was believed to be a man of sterling integrity and unusual executive ability.

There is no question from the record but that those who attended the meeting at the Chicago Club on Sunday afternoon, April 9th, and further conferences during the days following, were responsible for the selection of the names later presented to the court. The participants included representatives of the leading banks of Chicago. Lawyers attending were interested, not only as counsel for certain of the so-called Insull companies, but were themselves owners of common stock of Middle West.

Mr. Tobey was a member of the firm of Isham, Lincoln & Beale, who had for a long time represented Samuel Insull personally. They were counsel for the Commonwealth-Edison Company, the Public Service Company of Northern Illinois, Insull Utilities Investment, Inc., and at various times had represented Middle West. Mr. Tobey was the owner of common stock of Middle West and of securities in other Insull companies.

Mr. Schuyler's firm had done some personal work for Samuel Insull, and at that time he owned 30,000 shares of common stock of Middle West, for which he had paid about $300,000.

Evidence was introduced showing the extent at that time of the holdings of securities of the various Insull companies by the banks whose representatives participated in these conferences.

In this connection, it is important to note that, throughout the hearing, frequent reference was made to certain of the Insull companies as the three large operating companies. By this characterization were meant Commonwealth-Edison Company, which is the company controlling and operating the electric industry in the city of Chicago; People's Gas, Light & Coke Company, which controls and operates the gas utility in the city of Chicago; and Public Service Company of Northern Illinois, which is the corporation owning and operating electric, gas, and other utilities in the territory adjacent to Chicago and generally throughout the northern part of Illinois.

The banks were very heavily interested in the ownership of securities of these three operating companies and also in large amounts of the same which were held by the banks as collateral security on private and individual loans. These three operating companies formed the real foundation upon which the Insull utilities organization had been constructed. All three of them were solvent, paying dividends, and their capital stock was widely distributed and held by hundreds of thousands of individuals who regarded their securities as most valuable and substantial assets.

There was deep concern on the part of the banks lest the collapse of the Middle West and its affiliated investment trusts might have such far-reaching results and consequences as so to shake public confidence in these three primary operating companies that the debacle would engulf them as well as Middle West and the investment trusts.

There is no question but that representatives of the banks had a large and controlling voice in the determination of the selections that were later recommended to the court for appointment as receivers. If they were endeavoring to secure the appointment of receivers who would be friendly to their interests, to the prejudice of stockholders and other creditors, their activities and participation in these several conferences were highly objectionable and improper. On the other hand, if they were moved rather by a desire to secure the appointment of receivers who would be able and interested to conserve the assets of the company without partiality or discrimination, and to aid and assist in having recommended to the court receivers who would hold paramount the interests of the stockholders and general creditors, it cannot be said that in such case their participation in these preliminary conferences was collusive or unlawful in the sense of imposing upon the court or attempting so to do.

It is therefore pertinent at the outset of a consideration of this question to consider the nature, character, and extent of the holdings by the banks of the various forms of capital securities and obligations of the Middle West and its affiliated investment trusts, as well as of the three operating companies above named, which were also controlled and dominated by Samuel Insull and his organization.

The evidence shows that the four Chicago banks represented at the conferences in question held as collateral to various loans more than 3,700,000 shares of common stock of Middle West, exclusive of other blocks of the common stock of the company which they held in various trust accounts. There were more than 1,200 borrowers who were pledgors of this stock at the Continental and First National banks. The First National, Continental, and Central Republic at that time held as collateral over 50,000 shares of the preferred stock of Middle West, and either owned or held more than $1,350,000 in par value of its 6 per cent. gold notes. Halsey, Stuart & Co. had headed the syndicates which had sold the notes, and was itself a creditor in the amount of $2,500,000.

These banks were heavily interested in the common stocks of the three Insull so-called operating companies. There was pledged with them more than 27 per cent. of the outstanding common stock of People's Gas, Light & Coke Company, approximately 22 per cent. of the common stock of Commonwealth Edison Company, and approximately 16 per cent. of the common no-par stock of Public Service Company of Northern Illinois. They held more than 23 per cent. of the common stock and more than 6 per cent. of the convertible preferred $100 par value 6 per cent. stock of Middle West; 8 per cent. of the $3 convertible preferred series A, and 5½ per cent. of the common stock, of Midland United Company; substantial amounts of the preferred 7 per cent. prior lien, preferred 6 per cent. prior lien, and preferred 7 per cent. class A stock of Midland Utilities Company; more than 45 per cent. of the $3 optional preferred stock of Corporation Securities Company and 13 per cent. of its common stock and a substantial amount of its 5 per cent. serial gold notes due in 1932–1935; more than 40 per cent. of the $5.50 prior preferred no-par cumulative stock of Insull Utility Investments, Inc., approximately 20 per cent. of its preferred second series no-par stock, more than 10 per cent. of its common stock, and some of its 6 per cent. series B 1940 gold debentures.

The Continental and the First National had the larger holdings. The Continental individually held 87,147 shares, or 13.04 per cent., of the outstanding common stock of People's Gas, Light & Coke Company, 149,692 shares, or 10½ per cent., of the outstanding common stock of Commonwealth Edison Company, 43,924 shares, or 8.7 per cent., of the outstanding common stock of Public Service Company of Northern Illinois, 2,664,121 shares, or 17 per. cent., of the common stock of Middle West, 39,477 shares of $6 convertible series A cumulative preferred stock of said company, and owned outright $338,000 of its serial convertible gold notes. It held 327,851 shares of the common stock of Midland United Company and 29,645 shares, or approximately 1.8 per cent., of the outstanding convertible $3 preferred stock series A of said company. It had in its own investments $2,775,000 par amount of the 5 per cent. serial gold notes due 1932–1935 of Corporation Securities Company, more than 260,000 shares of the $3 optional preferred series 1929 stock of said company, and more than 1,350,000 shares of the common stock of said company; and sub-

stantial holdings of the securities of Insull Utility Investments, Inc.

It must be conceded, therefore, that the interests of the banks in the conduct of the proposed equity receivership extended beyond their collaterally secured commercial notes against Middle West. They were not only vitally interested in the preservation of values in the common stock of that company, but were certainly interested because of and influenced by their very large holdings of the common stocks of the three solvent and sound operating companies.

The decision that receivership was inevitable was reached several days before the bill was filed in this case. For over three months the banks had been first concerned and later alarmed by the prospects of impending receivership. The meetings and conferences at which the proposed receivership was discussed were admittedly held in private, and the public generally was without information concerning them. The bill of complaint was filed late Thursday afternoon, April 14th, and presented to the court Friday morning, April 15th; at least as early as the Sunday previous to the filing of the bill Mr. Schuyler learned that it had been decided to ask for the appointment of receivers. Mr. Tobey likewise knew as early as the Sunday previous to the filing of the bill of the contemplated receivership. Both Mr. Schuyler and Mr. Tobey were invited to and attended the meeting at the Chicago Club on the Sunday referred to, four days before the bill was filed. The banks knew that receivership was impending, and, on Friday of the week before the receivers were appointed, they became fully convinced that it was inevitable. Neither the individual stockholders nor the banks, represented by their officials, who participated in the preliminary conferences, sold any of their securities, although they must have known that the appointment of receivers would seriously depress, if not destroy, the market for their holdings. To me this is a very significant circumstance as shedding light upon the good faith or collusion of the parties participating in the meetings and conferences. The fact that none of these parties attempted to unload upon the public his or their security holdings in Middle West and the investment trusts by sales on the stock exchange or otherwise merits commendation, and is evidence against the charge that these gentlemen were actuated by improper motives to damage or injure the common stockholders of the company.

This observation applies as well to Halsey, Stuart & Co., who as investment bankers had sold large amounts of Insull company securities and themselves had very substantial investments therein. H. L. Stuart, representing this investment banking house, went with Samuel Insull to New York and participated in the conferences with Owen D. Young and the New York bankers the week previous to the filing of the bill; he returned with Insull to Chicago and attended the Sunday conference at the Chicago Club. From the evidence it appears that he was less willing than were the representatives of commercial banks to accept Arthur Andersen's figures and conclusions, and apparently not until Samuel Insull himself admitted the certainty of receivership did Mr. Stuart cease to give aid, assistance, and encouragement in the hope of preventing the collapse of the Insull companies.

With this proof of the unquestionable duty and desire of these banks to conserve the assets of Middle West, and thereby protect the values in its property and assets for the benefit of the holders of its common stock, the conclusion can hardly be drawn that their interest in protecting their secured loans was the only motive or occasion for their very pronounced activities and participations in the conferences preliminary to the filing of the bill.

The conditions through which we have passed since the year 1931 are probably such that a court of equity should take judicial notice thereof. However, the record made at the hearing in this inquiry contains clear and convincing evidence of the very unusual and trying situation confronting business generally and the banks particularly during the last three or four years. The representatives of these banks were naturally fearful that the crash of this great union of affiliated corporate properties under the leadership of one holding company such as the Middle West would quite naturally have most far-reaching effects and consequences. The record shows that the banking fraternity in the great financial centers, and all those at all familiar or acquainted with the situation, were seriously alarmed and anxious as to the possible consequences of the financial collapse of the Middle West. The banks had withstood many violent financial shocks prior to that time. The heads of these institutions, better than any other business men, perhaps, could and did foresee the possible consequences of the Middle West organization crumbling into dismemberment or bankruptcy; they were in daily contact with the rep-

resentatives of hundreds of thousands of individual investors whose fortunes had been staked on their faith in Samuel Insull and his financial policies and activities. Already there had been many serious bank and business failures. The financial strength of the nation, represented and typified in its banking structure, had already paid heavy toll to the consequences of the depression.

It is contended by counsel for the banks in this proceeding that the executives of those institutions were naturally and properly interested for the common good, not only of the immediate stockholders and creditors of Middle West, but of the citizens of the country as a whole, in lightening so far as possible the shock which would inevitably follow the appointment of receivers for a company possessing such a vast aggregation of property and representing such investment as that of Middle West; and that, instead of subjecting these bankers to castigation and reproach, their conduct should bring commendation and praise. Whether their contention in this respect is to be admitted, it is not necessary for the chancellor now to determine or decide. But that they were not presumptuous in assuming some responsibility in aiding in the selection of the men who would be recommended to the court for appointment as receivers must certainly be acknowledged. From the record, the court is impressed with the conviction that they were not actuated by the selfish motive of protecting their own secured debts against the interests of common stockholders and other creditors and investors generally, and that their conduct in this respect does not therefore amount to collusion as that term is applied to the judicial attributes of a court of equity. Some discussion as to the proprieties of actions of creditors in the position of the bankers in such cases as this will appear later herein.

However, it is claimed that, whether the bankers and lawyers who participated in these preliminary conferences were guilty of collusion by such participation or not, yet a fraud was committed upon the court by failing to advise the chancellor when the motion for appointment of receivers was made, of all the previous and preliminary conferences and meetings. This proposition raises an important legal question. The meetings had been without publicity, so far as the participants could control that element. The parties tried to arrange their conferences and conduct them without the public becoming advised of the seriousness of the gatherings and of the subject-matter discussed. Counsel boldly suggest to the court that in the very nature of things it was important that the public be not alarmed by publicity of the fact that preparations were under way to appoint receivers for these vast properties. On the other hand, counsel representing Mr. Pollak contend that the fact that such meetings and conferences were secret and private stamps them with bad faith and is evidence of collusion and fraud.

Undoubtedly if these conferences were for a sinister or unlawful purpose or design, and the participants guilty of conspiracy against the interests of other creditors or stockholders, such conduct would well merit condemnation. On the contrary, if the meetings and conferences held and the secrecy observed were due to a desire to prevent public excitement and the institution of proceedings in foreign and different jurisdictions, and the commencement of attachment suits and other litigation, it should not be asserted that the meetings and the lack of publicity attending the same were improper or constitute evidence of unlawful collusion.

We come, therefore, to the actual filing and presentation of the bill in this court for appointment of receivers, and to the conduct of counsel, the representations made, and the information disclosed to the chancellor at that time.

In this connection it is important to observe that among those who attended the preliminary conferences it was agreed that a bill should be filed and presented at the end of a calendar week when the security stock exchanges would be closed or closing for the week end. However, knowledge of the fact that the bankers were conferring about the Insull situation and that receivership was threatened became more or less a matter of public knowledge; and it was seriously feared that, if there were further delay in filing the petition, receivership proceedings would be instituted in some other jurisdiction. Other litigation was impending. It was believed that the proper jurisdiction for the administration of the equity receivership was Chicago, where Middle West had its principal office, and not in Delaware, where the company was organized, or in some jurisdiction remote from the executive offices of the company. The court is of opinion that all counsel appearing in this case will agree to the wisdom of that conclusion.

Accordingly, the firm of Isham, Lincoln & Beale, who were counsel for the Middle West Utilities Company, proceeded to pre-

pare the initial bill of complaint, and participated in certain conferences at which Lincoln Printing Company was selected as a friendly creditor to file the bill. The firm of Essington & McKibbin was selected as the lawyers to act as counsel for the complainant, and upon request accepted that employment.

There has been no suggestion presented to the court that the law firm of Essington & McKibbin was not of such standing, reputation, and ability as to undertake a responsibility of this character. It is true that their selection to act in the capacity of attorneys for the plaintiff came from the counsel for the company, and that Samuel Insull himself asked Mr. Flexner, as president of the Lincoln Printing Company, to have his company appear as plaintiff in the case. If these suggestions and requests were not a part of a conspiracy either to commit a fraud upon the court or to injure or defraud other creditors or stockholders, they were not improper. Once the responsibility was accepted, discharge thereof rested entirely upon the integrity of the counsel chosen and upon the good faith of plaintiff.

On the afternoon of April 14, 1932, the bill was filed by Mr. Essington, and on the following morning, April 15, 1932, he appeared in court and presented the same. I have refreshed my recollection of what then occurred by reading a transcript of the proceedings of that day.

The answer of defendant admitting the allegations of the bill of complaint was filed and presented; therein defendant consented to the appointment of receivers as prayed.

Thereupon the court inquired if there were others present who desired to be heard, and a Mr. Leopold appeared, saying that he represented a stockholder owning one hundred shares of the common stock of Middle West. He objected to the appointment of any receiver, for the reason, as he then stated, that the company was not insolvent. He referred to its financial condition, as shown by its annual statement dated December 31, 1931, which indicated that the company had a surplus of $6,000,000. It was the position of the objector, therefore, that no receivers should be appointed, but that the company should be allowed to proceed under the management of Samuel Insull, and that the best interests of the company required that there should be no interference with his management and domination. It was pointed out that there was danger of judgments by diligent creditors, institution of garnishment suits, levy of executions, and institution of conflicting litigation.

It was determined by the court that the bill filed by a bona fide creditor and confessed by the answer was sufficient to require the court to take jurisdiction and appoint receivers. Thereupon counsel for plaintiff, at the invitation of the court for suggestions, in accord with previous practice, suggested the names of Samuel Insull, Edward N. Hurley, and Charles A. McCulloch, and explained that it was deemed desirable to ask that Samuel Insull be named as one of the receivers on account of his familiarity with the company and its affairs. It was further explained that neither Mr. Hurley nor Mr. McCulloch were officers or creditors of the company, and a brief recital was made of facts with regard to them and their business connections. Thereupon the chancellor announced that receivers would be appointed, but that he desired to think of the personnel of the appointees and to consider what had been said, and requested that the gentlemen call upon him in chambers so that he might have an opportunity to meet and talk with them. A recess being taken, the judge retired from the bench, and the three gentlemen named were brought to his chambers and there interviewed by him at some length.

Each of these gentlemen first came into the judge's chambers alone. He explained to them the character of the trust for the administration of which they had been nominated. Then the three of them came in together, and there was further conversation concerning their proposed appointment. The judge stated to Samuel Insull that he was known as a man of dominating personality; that it had been suggested that there be three receivers, and that the court was of the opinion that the magnitude of the trust justified and required that, at least temporarily, three men should be appointed; that the court wished it distinctly understood that it was to be a three-man receivership and not a one-man receivership; that no one receiver should dominate it: that, if the court learned that the receivership was being dominated by Mr. Insull or by any one receiver, it would take immediate steps to correct that situation. To Mr. McCulloch the court remarked that he expected independent thought and responsibility by each receiver, and inquired if he were a "yes" man, to which Mr. McCulloch replied that, if the court knew him as well as his friends did, he would not make such inquiry. He asserted that the court need have no misgivings in that respect.

This was the first meeting between Mr.

McCulloch and the judge of the court, who, however, had met Mr. Hurley, and knew of the wide and favorable reputation he bore as a business man and the responsibilities he had met and carried with honor as a public official. The judge remarked that he knew of Samuel Insull, but had no real personal acquaintance with him, and impressed upon the three gentlemen that, if they should be named, the court would require equal responsibility from each of them and no domination by any one of them in the discharge of their duties. Mr. Bruce Johnstone, of the firm of Burry, Johnstone, Peters & Dixon, appeared and reported that he had been told request would be made for the appointment of his firm as one of the counsel for the receivers. He suggested to the court the imperative importance of as prompt and expeditious action in the premises as was reasonably consistent, to the end that ancillary receivership proceedings could be instituted in other jurisdictions to prevent conflicting appointments or the institution of other litigation, which might interfere with orderly administration of the trust by this court.

After the interviews with Messrs. Insull, Hurley and McCulloch, the court returned to the bench and announced that he would accept the suggestions made by counsel for appointment, and entered the order.

There was no statement made to the chancellor of the nature, character, number, and extent of the conferences or meetings out of which had come the names of the three men suggested to the court for appointment. It was stated that there had been discussion on that subject-matter by interested parties; and it was, of course, presumed that some thought had been given to the matter previously. The counsel who presented the petition and made the nominations for receivers was a reputable member of the bar, of high standing in the profession, and known to the chancellor to be a lawyer of integrity and ability. The chancellor has a right to presume that nominations for receivers are made advisedly upon due reflection and consideration of counsel and interested parties, and that counsel acting in that capacity in like manner have the requisite information concerning the men whose names are suggested for appointment as receivers in an equity proceeding, and that he will divulge to the court all such information. Mr. Essington was not, at the time he presented the bill of complaint, a stranger to the practice and conduct of equity receiverships. He had previous experience in such proceedings, and there is nothing in the record to indicate

that the confidence reposed and indulged by the court toward Mr. Essington in the exercise and discharge of his professional responsibility was misplaced or misjudged. In other words, the court believes that he divulged to the court all information he had. Whether Mr. Essington should have been better informed raises another question discussed hereinafter.

It is not inappropriate to remark here that, while radical differences of opinion have been manifested among counsel interested in this case, at times evidenced and disclosed in bitterness of heated and acrimonious debate before the court, yet at this time I indulge no feeling that any counsel appearing for any interested party in this inquiry has been moved or actuated by any motive other than that of presenting his cause in the interest of his client as his conscience dictates, and with no sinister purpose for self-aggrandizement, or to cause injury to the trust here being administered.

Some observations of the prevailing practice in so-called consent or friendly receiverships may serve to clarify somewhat the precise issues in this case. The bankruptcy court is open to a voluntary petition by a corporation, but such applicant, desiring to avoid forced liquidation, which is the ordinary result of bankruptcy, finds no similar adequate opportunity for relief by voluntary petition in a court of equity. If a company with frozen assets finds itself unable to meet maturities, but believes in good faith that it has property of such character that, if properly conserved and managed, it may eventually be disposed of with resulting advantage to creditors and stockholders, and therefore desires to avoid liquidation in bankruptcy, it usually finds itself, under our equity rules, unable to appeal directly to the court for relief. In some instances the corporation has deemed the facts to be such that it could go into court as a plaintiff, making its lienholders defendants, and upon proper showing secure the appointment of a receiver. See Wabash, etc., R. R. Co. v. Central Tr. Co. (C. C.) 22 F. 138. Such proceeding has been criticized, however, and never directly approved by the Supreme Court, though the bill in the last case mentioned was discussed incidently in Quincy, etc., Co. v. Humphreys, 145 U. S. 82, 12 S. Ct. 787, 791, 36 L. Ed. 632, where the court said: "The bill was obviously framed upon the theory that an insolvent railroad corporation has a standing in a court of equity to surrender its property to the custody of

the court, to be preserved and disposed of according to the rights of its various creditors, and, in the meantime, operated in the public interest."

Later the court cited the case in such manner as to indicate that it regarded the theory with approval. Re Metropolitan Ry. Receivership, 208 U. S. 90, 28 S. Ct. 219, 52 L. Ed. 403.

Suffice it to say, this method of procuring receivership for an involved corporation has not been widely followed. The bar quite generally has preferred to invoke the court's jurisdiction of a cause of action by a bill filed by a creditor, making the involved corporation a party defendant. In accordance with well-known equity rules, such a bill could not succeed upon the application of an unsecured creditor. Rather it was necessary that the plaintiff show that he had procured judgment, had execution issued upon the same, and that the latter had been returned "no property found, subject to levy." The resourcefulness of counsel soon led a step further, to the plan of arranging to have a friendly simple contract creditor file the suit and the defendant corporation enter its appearance, admitting the allegations of the bill and consenting to the relief prayed for, thereby waiving the right to object because a judgment had not been obtained. This practice received the approval of the Supreme Court in the case of In re Metropolitan Receivership, supra, in which that court announced that, so long as the indebtedness of defendant to plaintiff was real and the diversity of the citizenship of the parties likewise real, there was a controversy of which the District Court had jurisdiction, and that the parties were not guilty of collusion because the defendant arranged with its creditor to have the suit brought and then admitted the averments and the allegations of the bill, including a consent to the appointment of receiver.

█ Many cases have followed such practice, and it appears now to be well settled that a corporation finding itself in the condition mentioned may persuade one of its friendly creditors to file suit against it, praying for the appointment of receiver; that it may prepare the bill for the plaintiff's solicitors; that it may legitimately cause the institution of the suit, go into court, admit the allegations of the bill, and consent that the relief prayed for be granted. The case will not be regarded as collusive merely because the parties to the suit acted in accord and arranged together that the suit should be brought in a given court and that the averments of the bill should be admitted. U. S. v. Butterworth, 269 U. S. 504, 46 S. Ct. 179, 70 L. Ed. 380; Black & White Taxicab, etc., Co. v. Brown, etc., Co., 276 U. S. 518, 48 S. Ct. 404, 72 L. Ed. 681, 57 A. L. R. 426; May Hosiery Mills v. U. S. District Court (C. C. A.) 64 F.(2d) 450; American Brake Shoe & Foundry Co. v. Pere Marquette R. Co. (C. C. A.) 205 F. 14; Equitable Trust v. A. C. White Lumber Co. (D. C.) 41 F.(2d) 60; Kingsport Press v. Brief Eng. Systems (C. C. A.) 54 F.(2d) 497; Michigan v. Michigan Trust Co., 286 U. S. 334, 52 S. Ct. 512, 76 L. Ed. 1136; Newberry v. Davison Chemical Co. (C. C. A.) 65 F.(2d) 724; Dickerman v. Northern Trust Company, 176 U. S. 181, 20 S. Ct. 311, 44 L. Ed. 423.

Such proceedings are in effect voluntary proceedings for receivership by the involved corporation. The parties accomplish indirectly what the law affords no adequate opportunity to do directly. The Supreme and other courts, recognizing the difficulties of the situation, have placed their stamp of approval upon such practice. "The fact that the consent receivership is constitutionally a 'controversy' and that it continues the forms of an adversary creditors' proceeding, tends to conceal its true nature as a judicial moratorium against creditors, procured in the hope of eventual reorganization. Clearly, this advice may serve useful and legitimate ends by making possible the continuance of enterprises whose destruction would be socially wasteful and whose worth for all creditors depends largely on the maintenance of good will and going concern values." See Harvard Law Review, March, 1934, p. 828.

It may be well that some other mechanics should be provided; that Congress should enact legislation which will furnish the means whereby direct proceedings for the same result may be had. It is significant in this respect that such legislation has been provided by a recent amendment to the Bankruptcy Act (11 USCA § 205) permitting railroad corporations to go into the bankruptcy court, without adjudication, procure extensions of maturities, and endeavor to work their way out. But Congress, thus far, though a bill to such effect is now pending, has not seen fit to extend the provisions of the amendment to corporations of other character. It has to date left such organizations without remedy in the bankruptcy court other than to secure an adjudication

and bring about forced liquidation or to make a composition, that is, a settlement, with its creditors.

In other words, in this respect, necessity has been the mother of invention, in development of the present practice, and courts of equity, desiring to prevent irreparable injury to citizens, have approved the validity thereof, for the reason that, if some method of procuring a temporary moratorium is not provided, there will be a race of diligence and resulting disorganization and destruction of corporate assets and business. The diligent creditors with judgments and executions may obtain payment in full and the remains of the estate be left to the less fortunate creditors in a forced bankruptcy liquidation. An interesting analysis of facts and results in "friendly receiverships" in the federal courts of Massachusetts appears in Harvard Law Review for March, 1934, at page 828.

So it can be safely stated that the acts of the Middle West and its counsel in procuring the plaintiff to file a bill and to suggest nominees for receivers were not of themselves subject to condemnation. Similar proceedings have been approved by the Supreme Court.

Nor, as we have seen, can we attribute anything improper to the mere fact that there were conferences of the interested parties. Obviously, when considering the affairs of a corporation with property scattered over the greater part of the nation and trying to decide upon policies, in order to prevent the institution of multitudinous suits at law, in attachment or in equity, it is absolutely essential that, until the bill is filed, quietude should prevail.

It would have been desirable here, of course, from a standpoint of ideal representation of all interested parties, to have had a public hearing, after due notice to the thousands of stockholders and creditors. It would have been ideal if all parties in interest could have had a chance to be heard at such a meeting. But the same difficulty that forbids as practical action, the making of laws for the state or nation by a meeting of the entire population, prevailed here. A meeting such as that mentioned would have resulted in no practical advantage and would have brought about that which it was feared might intervene, the expense of ruinous, multitudinous litigation and the consequent hampering of an orderly administration. It would have caused a flood of selling of Insull Securities with consequent destruction of market values. Prevention of publicity was necessary and did not of itself invalidate the proceeding.

However, the crucial issue in this case is not disposed of by these comments. The features that caused criticism are that one of the appointees of the court was a chief executive of the corporation; that the other two were directors of creditor banks; that the firms of counsel to represent the receivers were suggested by the banks; that one of them had represented an allied investment trust company as counsel, and, to some extent at least, Samuel Insull; and, further, that some of the interested parties conferring had in February discovered through the investigation by the auditor employed by the New York banks, Arthur Andersen, that Samuel Insull had transferred funds from at least one corporation upon what was termed an improper basis from the point of view of proper corporate financing.

We have seen that the executives of the Chicago banks were convinced that Mr. Insull should not have a controlling voice in the receivership, that it was his suggestion that he be made general manager for the receivers, and that some of the creditors, having received from Mr. Andersen some information with regard to Mr. Insull's methods of corporate financing, were not willing that the latter should have a dominating place in the picture. They felt, however, that the creditors and stockholders should have the benefit of Insull's operating ability, his familiarity with the involved corporate structure and his knowledge of the properties, at least initially or temporarily, but that there should be associated with him two co-receivers of high character and independence who would act aggressively for what they believed proper. Consequently they would not recommend Insull as general manager, but thought it desirable to have him as co-receiver. The parties participating in the various conferences eventually agreed.

When the application for receivers was presented by counsel for plaintiff, the court announced that the only reason for appointing Mr. Insull as temporary receiver lay in the desirability of having the benefit of his knowledge and experience. The details of the condition of the estate were not then known. The court was not informed of any secret meetings. It assumed that the parties who were interested in the estate had had some conversation and that the nominations made were the result of their best judgment. Obviously, the creditors were zealous. Obvi-

ously, in view of the wide-flung properties of the estate, the various securities quoted upon the exchange markets, and the hundreds of thousands of investors within the district, the bankers were deeply interested in securing an orderly and efficient administration. But there arises here the very pertinent question of why the interested parties did not disclose to the court the actions of Insull, which were deemed improper from a corporate financial standpoint. They felt that Insull should not dominate, but that he should be in, the picture. Such, however, was their own decision based upon facts known to them but not presented to the court. If the parties at that time had doubt as to Insull's character as a financier or as a corporate executive, the one person in the world that was entitled to know of such doubt was the chancellor who sat as the agency created by Congress to designate the arms of the court, who should take hold of, nurture, conserve, and administer a sick corporation. No creditor, no party in interest, had the right to say to himself that he did not believe Insull could be trusted as sole manager; that he must be watched by others, but that, notwithstanding this fact, the court would be asked to appoint him receiver. These intensely interested parties assumed for themselves the right to determine whether the man should be recommended, rather than submit to the court their knowledge of his previous conduct.

I attribute to these gentlemen the honesty of act and purpose to which they have attested. I do not challenge their motives, for I believe that they were sincerely attempting to bring about a receivership that would be capable, honest, and efficient. But it is apparent to me that in their zeal, in their fear that some catastrophe might occur, they forgot that, rather than say to the court that they believed this man should be appointed, they should have said: "These are the facts with regard to this man. We believe his appointment essential to an efficient administration, but we submit the facts to the Court for its decision." What the chancellor's action in that situation would have been is probably best demonstrated by the fact that, when the first audit of an associated company was made and came to him, upon learning therefrom the circumstances of the removal of certain corporate funds, the court immediately set in motion the acts leading to Samuel Insull's discharge.

What has been said in this respect is not intended as a judicial finding that there was fraud in failure to disclose the facts aforesaid. It is intended rather as an expression of what should be the guide to interested parties in consent receivership with regard to disclosure of facts to the court, and as a caution that, no matter how honest a creditor may be, no matter how creditable or praiseworthy his motives, he may not rightfully make a decision upon facts which should in the first instance in all fairness be submitted to the chancellor, in order that the latter may act with the greatest possible wisdom and discretion. "The problem is one of providing the court with sufficient information to allow an intelligent exercise of its discretion." Harvard Law Review, March, 1934, p. 831; First Nat. Bank of Cincinnati v. Flersheim, 290 U. S. 504, 54 S. Ct. 298, 78 L. Ed. ——.

It is immaterial how many conferences the interested parties may have; even though such meetings be behind closed doors, for there may be necessity of quiet consideration. The court cares not that the parties may bring about a friendly receivership, so long as they comply with the rules governing same, announced by the Supreme Court. It cares not that they come into court with nominees. But counsel for the friendly creditor, who makes the suggestion, should be possessed of all the knowledge, all the information about the nominee, that the parties themselves have, and present the same to the chancellor. The place for decision as to whether a nominee is a proper party as general manager or a receiver is in the court, and it is essential that no party in interest allow his fear of damage to the estate, of disruption of assets, of disorder and turmoil, to cause him to forget that in the last analysis the chancellor is the party responsible for the appointment and the judge as to whether any particular individual should be appointed, and is therefore entitled to know all of the facts that the parties themselves know.

Apparently counsel for plaintiff, who filed this bill, did not know of the actions of Insull that were subject to criticism. Their connection with the matter arose upon invitation of the involved corporation's counsel to represent a hitherto unknown creditor by filing the bill for receivership, and to make suggestions of the names that had been agreed upon previously. The same duty existed upon the part of the interested parties who procured such counsel's action to give to them the same information as that to which the court was entitled, in order that they might fully advise the court.

However, Samuel Insull was very soon

removed from a position of authority, not only as receiver of Middle West, but as a dominating executive of the other corporations he had organized and controlled. The court told him he must resign; the banks told him he must resign; and his co-receivers told him he must resign. The court's silence with the co-receivers, for a few days, until the latter learned of the facts and acted, resulted in a true test of their sincerity. They did not fail to take immediate action, but acted as promptly then as they had when, within twenty-four hours of their appointment, they dismissed one important executive and within a very short period, another, because of discoveries made as to them.

This brings us to the question of whether or not Mr. Hurley and Mr. McCulloch were disqualified as receivers. We have seen that, when the court questioned them, they assured it of their independence and their ability to prevent Samuel Insull from dominating the receivership. The fact remains that each was a director of a creditor bank. Nor can there be any question as to the duties or position of directors of corporations. They are the fiduciary agents of the corporation, who possess all the power granted by statute which the charter contains, and act with regard to the property of the corporation in every way as if they owned it, except as limited by statute and charter. As such fiduciaries, consequently, Mr. Hurley and Mr. McCulloch owed allegiance to their respective banks as members of the board of directors. Probably had somebody made specific objection to either of these gentlemen upon this ground when they were appointed, the court would have asked for other nominees, for it is easily appreciated that they might be embarrassed by criticism in the future, even though the same should not be warranted by the facts. And I have no doubt that were Mr. Hurley alive both he and Mr. McCulloch would frankly admit that, had such objection been raised to their appointment and had they foreseen criticism because thereof, they would have declined to act.

I do not mean to say by this that these gentlemen were disqualified by reason of their directorship of the respective banks. Whether any man is disqualified depends upon the facts and circumstances of each case. No man of high character will knowingly attempt to serve two masters, but the actual question here is whether the facts and circumstances were such here that there could be or was any conflict of interest between the banks and the receivers.

Mere connection with one of the parties is not a disqualification. The mere fact that the plaintiff or defendant suggests the name of the proposed appointee is not a disqualification. In fact, the members of a special committee of the Chicago Bar Association recently made a special report upon the subject of receiverships in which they criticized certain judges who did not give effect to the recommendations of the parties in interest. This report was accompanied by a brief of authorities, where the point was made that the recommendation of those most interested and most likely to sustain injury should generally be most regarded. The committee disapproved and almost condemned personal appointments by the chancellor.

It has long been the practice, if the circumstances warrant it, to appoint as one co-receiver, at least, an officer or executive of the involved corporation, especially where the receivership is so involved that it requires intricate knowledge of the involved details of the company and its affairs. Instances are to be found in the following cases: Ward v. Foulkrod, 264 F. 627 (C. C. A. 3); Lotte Bros. et al. v. American Silk Co., 159 F. 499 (C. C. N. Y. 1907); Fowler v. Jarvis Conkling Mortgage Trust Co. (C. C.) 63 F. 888; Id., 66 F. 14 (C. C. N. Y. 1894); Farmers' Loan & Trust Co. v. Northern Pacific R. R. Co., 61 F. 546 (C. C. Wis. 1894); In re Babcock, 26 F.(2d) 153 (C. C. A. 7, 1928); Olmstead v. Distilling & Cattle-Feeding Co. (C. C.) 67 F. 24; Id., 73 F. 44 (C. C. Ill. 1895).

In unfortunate and distressing times when receiverships are numerous, there is a constant recurrence of the question of personnel of appointees. I apprehend most chancellors would find their duties much lighter and more pleasant if they were relieved of making such appointments. But the responsibility must be met, and it is most difficult to announce any general rule that will apply under all situations. Probably we can all agree that there should be at least one receiver who has complete knowledge of the property, and that in many instances the court may deem it advisable for good cause shown to name some one connected with the business or with some other party in interest. If only one receiver is to be appointed, it seems a safe rule that he shall be a person who has no interest, directly or indirectly, as owner, officer, director, stockholder, creditor, trustee, official, or agent, in the property of the receivership. If two receivers are to be appointed, at least one of them should possess the qualifications specified, and, if more

than two receivers are to be named, the majority should meet the same standard. Some courts, perhaps, believe that the chancellor should rely upon his own knowledge of men and make appointments without suggestion. But it is a matter of practical impossibility for courts to acquire sufficient knowledge to act wisely without suggestions. It seems preferable, therefore, to appoint somebody suggested rather than to subject the court to criticism for appointments based upon insufficient knowledge of men and their connections.

With these requirements, it seems to me Mr. Hurley and Mr. McCulloch complied. It has been pointed out that the banks were interested, not only as secured holders of commercial notes, and as holders of unsecured serial notes, but also as holders of common stock and preferred stock, held as collateral for loans to customers. The percentages and amounts of these holdings have been set forth in detail. As a result of two years of administration, after investigation by receivers and their counsel, by the noteholders' committee representing $30,000,000 in unsecured serial notes, and by common stock and preferred stock committees and their counsel, it appears that there has been no controversy, no conflicting interest between the Chicago banks and the estate over any matter except the deposit of additional collateral security to existing indebtedness within four months prior to the filing of the petition for receivership and prior to the filing of an adverse petition in bankruptcy, filed simultaneously. It is well recognized that such a transfer of additional security to an existing indebtedness may not be attacked by a receiver in equity. He stands in the shoes of the corporation, for which he is receiver. He cannot maintain a suit to set aside any such preferential transfers. Such right of action is lodged solely in a trustee in bankruptcy, who may recover such transfers, if he can prove in a plenary suit that, at the time the property was transferred, the transferor was insolvent, and the transferee had reasonable cause to believe that he was thereby obtaining a preference.

When this situation developed, it appeared that it might be necessary, in spite of the undesirability of such action, so far as liquidation was concerned, to force the petition in bankruptcy to an adjudication and elect a trustee who might bring about the recovery of preferences. Thereupon the noteholders' committee intervened as additional counsel in the bankruptcy cause, and, in association with counsel for the petitioning creditors, insisted upon a trial. Counsel for common and preferred stockholders then appeared before this court and asked that an order be entered requiring the receivers to enter their appearance in the bankruptcy cause, representing the corporation, and defend the petition in bankruptcy. Such counsel insisted that bankruptcy would mean the elimination of their clients, the stockholders, from any equity in the property and from sharing in any distribution of the assets of the estate. Upon this motion the order of the court was that the receivers could not properly defend the petition in bankruptcy. To be required to do so would put them in a position of fighting a battle in behalf of the creditor banks, who, obviously, did not desire bankruptcy. Receivers in equity may not properly aid either party to a controversy between creditors. But, said the court, while it is not the receivers' duty to contest bankruptcy, counsel for the stockholders, interested in salvaging the equity of the estate for their clients, and therefore interested in preventing bankruptcy, should be and were authorized to contest the petition for adjudication.

In this situation, the only parties who had a right to object to the transfer, that is, the unsecured creditors, submitted to the banks the proposition of whether they would rather settle or fight it out in litigation of preference suits after adjudication in bankruptcy. A meeting of the interested parties occurred before Judge Wilkerson, who was hearing the bankruptcy proceeding, and myself, in which it was frankly stated that, if bankruptcy were to be averted, it would be because of satisfactory settlement of the parties, and that, in the absence of such agreement, within a reasonable time, the bankruptcy case would be set down for trial.

Thereafter a settlement agreement was negotiated by the noteholders, common and preferred stockholders, and petitioning creditors on the one side and the banks on the other. The position of the receivers all through the negotiations was one of neutrality. They were directed by the court, however, to furnish access to all their records to all the interested parties, so that, if settlement should be made, it would be with full knowledge upon the part of all interested parties of all such facts as the receivers could supply. Beyond that in such controversy the receivers could not go. They could not rightfully inject themselves into the dispute, and were without legal basis so to do.

If the calculation that has been supplied to the court is correct, as a result of the set-

tlement, the unsecured creditors and stockholders have obtained for the estate substantially the equivalent of what would have been obtained in bankruptcy at the end of successful litigation.

I have called attention to these facts somewhat at length in order to point out that the circumstances here did not put Mr. Hurley and Mr. McCulloch in a position of conflict with the banks, but rather left them as independent agencies, fearlessly doing their work of conserving the property, and leaving to those who had the right to complain the negotiation of a settlement with the banks. The facts and circumstances of this case, therefore, bring them within the category of parties who may have some connection with some creditor of the estate, but only such connection as will not prevent them from performing independently and aggressively their proper duties. Such were the circumstances in the cases last above cited where the courts approved the appointments.

It might be observed in this connection that, were this a bankruptcy case, Mr. Hurley and Mr. McCulloch could not qualify as trustees, for it would be the trustees' duty to bring suits against the banks to recover the alleged preferences. The fact that the same was true of Calvin Fentress in the bankruptcy case of Insull Utilities Investment, Inc., led Judge Wilkerson to say that, despite his high character, he was technically not qualified as trustee in bankruptcy. In the case before Judge Evans, in the same matter, it is well to observe, the position of the receiver in equity, with regard to the creditor banks, was at variance with the position of the receivers in this case. There it was contended by certain parties in interest that the cause of action to recover against the banks who held certain collateral of that company was lodged in the receiver in equity and was based upon a special covenant in the debentures which forbade, in substance, the hypothecation of collateral to bank creditors unless an equivalent deposit should be maintained in behalf of the other noteholders. If such cause of action was in the receiver, then it was his duty to prosecute the suit against the banks. For this reason, even though the receiver was of high and independent character, it was considered not fair to him to put him in the position of having to sue people who had recommended him as receiver. No such situation has existed in the present case. The Middle West notes contain no similar clause, but, on the contrary, the only right of action against the banks was one to recover preferences, which could be maintained only by a trustee in bankruptcy.

So I conclude that Mr. Hurley and Mr. McCulloch were not disqualified by the mere fact alone that they were directors in banks with whom as receivers they had no controversy. The principles announced in various decisions, it seems to me, are in complete accord with this conclusion.

It appears the firm of Burry, Johnstone, Peters & Dixon was suggested as counsel for the receiver by Mr. Brown or Mr. Traylor of the First National Bank, and that the firm of Schuyler, Weinfeld & Dunbar were suggested for the same position by Mr. Leavell of the Continental Bank. This fact did not, in view of what I have said regarding Mr. Hurley and Mr. McCulloch, disqualify either firm. Had it been the receivers' duty to sue the banks, they would have been disqualified as such receivers, and both firms of lawyers would likewise have been disqualified; but, under the facts as they have been related, there was no conflict of interest of disqualifying character.

A further question has been raised as to the qualification of Schuyler, Weinfeld & Dunbar. That firm was general counsel for an allied investment trust, Corporation Securities Company. They had never been counsel for Middle West. Mr. Dunbar in the past had been counsel for one of the constituent banks merged with the Continental. Mr. Schuyler had upon some occasions, perhaps many, been counsel for Samuel Insull. The record discloses that the intimate personal counsel of Mr. Insull were the members of the firm of Isham, Lincoln & Beale, but Mr. Schuyler had also served him. If there were any evidence that a firm of lawyers who had previously represented an executive of the corporation was suggested to the court with a view of protecting such executive in any matters that might grow out of the previous administration of the estate, clearly such suggestion should have been refused. But there is no such evidence, and, whether it was the most discreet or wisest policy to suggest the firm, the record is that there has been no conflict of interest disclosed to the court.

There was a tremendous amount of labor imposed upon the attorneys for the receivers from the beginning of the estate until recently. The process of organization, elimination, and correlation is lessening to such extent that the court has advised counsel for the receivers that it is now no longer necessary to retain two firms. The court has hes-

itated to decide between the two, but recently the firm of Schuyler, Weinfeld & Hennessey, in recognition of the court's suggestion and of the fact that the legal work henceforth will be less in volume so that one firm can take care of same, has asked to be relieved. This action is in accordance with the helpful spirit of counsel throughout the administration of the estate.

Considerable reference was made at this hearing to the opinion of Judge Evans in the Insull Utility Investment Bankruptcy Case. It must be apparent that the records there and here are vastly different. I do not find myself in disagreement with the pronouncements of Judge Evans as to the law, but there are differences in facts in the cases which distinguish them. In the first place, if Mr. McCulloch were suggested as trustee in bankruptcy, he would be disqualified, despite any question as to his character or fitness. If he, as equity receiver, had had a right of action against the First National bank and was under duty to enforce it, he should not have been appointed and should be relieved.

Judge Evans directly ruled that, in a receivership proceeding, the defendant may properly cause a suit to be brought against it by a bona fide creditor, and, by admitting the allegation of the complaint, join in the request for the appointment of receiver, and thus accomplish receivership. He especially held that such action is not collusive and implies no existence of fraud. The specific thing which Judge Evans condemned is the recommendation of a person for receiver for the purpose of protecting a former executive suspected of wrongdoing, without information of such fact to the court. In such situation, both the plaintiff and defendant remaining silent, obviously, there is collusion and a fraud upon the court. Just as apparent is the fraud in the case condemned by Judge Evans where a friendly receivership is instituted by a friendly creditor who suggests to the court one who cannot vigorously prosecute suits against secured creditors whom he has a right and duty to attack. There the failure to disclose the fact is clearly a fraud upon the court. No one has a right to speak in suggestion of receivers when the receiver to be appointed may be required in the performance of his duties to bring suit against such suggesting person. As Judge Evans points out, it is not the bringing of the suit by a friendly creditor nor the consent to the entry of a decree that is objectionable, but there is ev-

idence of collusion when a person owes his nomination to a fraudulent motive in his own or his nominator's mind, not disclosed to the court. Such is a desire to prevent a suit against the suggestor or to cover the peculation of a suggestor or to prevent suits against proper parties. Obviously any such suggestion without a disclosure to the court of the facts inspiring the same is a fraud which a court of chancery must condemn. It is a violation of conscience which affects the equitable relations between the parties and affects the action of the court.

Mr. McCulloch remains as sole receiver and Burry, Johnstone, Peters & Dixon as his counsel. I see nothing in the record, in view of what I have said, to disqualify either of them. Nor do I find evidence warranting a conclusion that Schuyler, Weinfeld & Hennessy were disqualified to act as counsel for the receiver.

To-day we are upon the verge of an attempt to reorganize. The noteholders' committee, the preferred stockholders' committee, the common stockholders' committee believe that the receiver has done an exceptionally creditable piece of work, and their praise of him in this connection is unstinted and liberal. They have all asked the court to retain the receiver and his counsel.

We approach, then, the primary and controlling purpose and objective of this receivership, which is the preservation of the trust property and the protection of the rights of the individuals interested therein. The administration of a trust of this character involves, occasionally, a balancing of equities in exceptional matters or points, but, over and above all, there is the paramount duty to see that each and every interest receives justice under the law and full recognition of its rights. Eventually, the basic question for the court is, What shall be done with the trust property; what action is best for the proper protection of the property and of the beneficiaries?

The conduct of any equity receivership is of necessity largely administrative; it involves more than a decision of "yes" or "no" upon a single issue or a multiple of single issues presented by appropriate pleadings. It involves decisions on matters of policy with nice gradations of refined reasoning and conservative judgment. It necessitates, first, consideration and conference by the interested party and his lawyer; then, perhaps, conference and discussion with other parties whose interests conflict and their lawyers; and, if agreement be not reached, the sub-

mission of controverted questions to the chancellor for decision. Quite frequently and constantly matters of policy cannot be presented to the chancellor by conflicting interests or by counsel holding conflicting views; yet it is the duty of receivers, as arms of the court, and their counsel, as officers of the court representing the receivers, to communicate with and appeal to the chancellor for approval or consideration or determination of a policy which has not been subjected to the refining clarity produced by discussion or debate between conflicting opinions of interested parties or their counsel. A particular subject-matter may present itself upon which the receiver himself, or the receiver and his counsel, find it necessary to submit to the chancellor different angles or views that may be held or taken in order to outline a policy or procedure concerning such subject-matter. The fidelity and ability of an appointed receiver is often manifested by his frank submission to the chancellor of questions of policies or courses of conduct concerning which two apparently equally consistent views may be taken. Such questions and situations constantly recur in the conduct of an equity receivership, giving to it a character requiring the exercise of administrative jurisdiction, as distinguished from decision of controverted or litigated questions.

This administrative duty of a court of equity, coupled with the ultimate duty to administer the estate wisely, compels, therefore, due consideration of the resultant accomplishments and developed progress in the administration of the trust in this case.

The accomplishments of the receivership as disclosed by the evidence introduced in this inquiry demonstrate the exercise of commendable judgment, foresight, and ability by the receivers and their counsel. A comparison of the financial condition of Middle West on March 31, 1932, and December 31, 1933 shows that:

The receivers have decreased the bank loans of the subsidiaries .............. $ 5,552,424.55
There was an increase of their cash balances between April 2, 1932 and January 27, 1934 of ........................... 4,186,377.14
They purchased $2,881,700 par value of outstanding bonds for .................. 2,276,619.00
The subsidiary operating companies have during that period invested cash in $2,155,000.00 of United States government bonds and certificates in the amount of ............................. 2,160,806.00

This makes a total improvement in the condition of these subsidiaries in the four items named of .................... $14,176,226.69

This last figure is exclusive of $605,081 improved funded debt liability, and representing discount at which the subsidiary companies purchased the $2,881,700 of their outstanding bonds.

The receivers for Middle West received between April 15, 1932 and December 31, 1933, income of ........................ $3,367,810.27
After the payment of expenses and $1,836,925.30 interest, they realized an excess income above expenditures of .......... 483,190.68
They had on December 31 last invested in United States government securities 375,862.17
And had a cash balance remaining of.... 847,077.87
They started with a cash balance on April 14, 1932 of only .......................... 52,525.31
And had on December 31 last a cash balance and investments in United States government securities of ................ 1,275,465.35

Middle West, as of June 1, 1930, issued and sold $50,000,000 of its 5 per cent. serial convertible gold notes, maturing at the rate of $10,000,000 per year on the 1st days of June in the years 1931 to 1935, both inclusive. The $10,000,000 maturity of June 1, 1931, was paid; the remaining $40,000,000 were outstanding, of which. $10,000,000 matured June 1, 1932.

On May 27, 1932, a meeting of certain holders of these outstanding notes was convened, and an organization perfected with Charles S. Dewey, chairman, and an employee of Halsey, Stuart & Co., secretary of the committee. The charge is made that this committee was dominated and controlled by the banks; but the evidence in the record does not sustain that allegation. On the contrary, the evidence shows that immediately upon the organization of the committee it aggressively pursued efforts to compel the banks to return collateral which they had received within four months prior to April 15, 1932. The committee demanded the return of this collateral, and then, as above mentioned, joined forces with the petitioners in the bankruptcy court for an adjudication in bankruptcy of Middle West, in the meantime negotiating with the banks for settlements which would afford the desired relief to the holders of the unsecured notes and the general creditors and stockholders without a liquidation of the Middle West through bankruptcy.

█ It has been urged that, wholly independent of the validity or propriety of the order appointing receivers for Middle West, the situation should not now be disturbed by vacating that order, thereby losing the benefits and advantages gained through the settlement agreements. The case of Harkin v. Brundage, 276 U. S. 36, 48 S. Ct. 268, 72

L. Ed. 457, and other authorities are cited in support of the proposition that, even if fraud were perpetrated in the application for receivers, the entire proceeding should not be dismissed, but that appropriate orders should be entered to preserve the benefits secured to the trust estate; that the policy of the court at this time should be controlled by the conditions now existing; and that therefore, in the light of the accomplishments of the receivers, the question of fraud and collusion upon the court in the first instance should be regarded as a moot question not requiring decision at this time or in the present inquiry. It must be admitted that the so-called bank settlement agreements, procured largely through the activities of the noteholders' committee and its counsel, have resulted in substantial benefit to the trust estate, which should not be now dissipated by a disposition of the pending inquiry that would nullify these accomplishments.

It was estimated by the noteholders' committee that the four months collateral in question had a value of $8,302,947.70. As a result of the settlement agreements, the noteholders and stockholders of Middle West benefited as follows: (1) The three banks gave up 33⅓ per cent. of their four months collateral; (2) Halsey, Stuart & Co. gave up 50 per cent. of its four months collateral; (3) the three banks released Middle West from its assumption of liability on loans totaling more than $2,900,000; (4) the three banks procured La Salle-Quincy Corporation to release Middle West from notes totaling over $4,000,000 and an open account of more than $200,000, and procured a subsidiary of La Salle-Quincy Corporation to release a subsidiary of Middle West from a claim of $23,000; (5) the three banks and Halsey, Stuart & Co. gave Middle West a cash credit of about $220,000 to apply on future interest, and reduced their interest rate from 4 per cent. to 2¾ per cent., representing an interest saving of about $177,000 per annum; (6) the deficiency claims of the three banks and Halsey, Stuart & Co. were reduced 66⅔ per cent.; (7) the gold notes owned by the banks, totaling over $800,000 were taken from a secured, and put upon an unsecured, basis, thus further increasing the distributive share of the noteholders; and (8) Middle West was also indemnified against a possible claim upon People's Trust Bank stock of a possible maximum of $250,000.

As a result of the bank settlements, the noteholders and stockholders were given a stronger position in a reorganization in important particulars, viz.: (1) The secured debt ahead of them was reduced by several millions of dollars; (2) their stock ownership in subsidiaries was increased by the return of collateral; (3) the assets of the estate were conserved in the meantime by the interest credit and the reduction in interest rate; (4) controversies were eliminated, and the necessity removed of delaying reorganization plans until the termination of expensive and extensive litigation, which would involve appraisals estimated to cost as much as $750,000; and (5) co-operation has been established among the interested parties by accomplishing substantially all that would be accomplished by setting aside alleged preferences to the banks, thereby affording encouragement to hope that the assistance of all creditors and stockholders to effect a reorganization of Middle West will be furnished.

Counsel for the petitioning creditors in the bankruptcy proceeding, who participated in this inquiry before the court, have presented herein, and asked leave to submit and file, a memorandum in behalf of their clients. Incorporated in their memorandum is an appendix showing an analysis of the settlements with the banks; and as a part of the appendix they submit three schedules as follows:

1. Assuming liquidation through bankruptcy and no recovery from the banks, a ratio of free assets to total unsecured liabilities equaling ..................................... 20.18%
2. Assuming bankruptcy adjudication and the controversies covered by the settlement agreements being entirely adjudicated in favor of the trustee (without considering expenses of litigation), a ratio of total free assets to total unsecured liabilities equaling ........................................... 26.22%
   (less litigation expenses)
3. Without bankruptcy adjudication, but giving effect to the settlement agreements with the banks, a ratio of total free assets to total unsecured liabilities equaling..... 25.67% but giving additional credit for $394,992.05 interest as additional advantage, the ratio would be increased.......................... .55%

or an actual ratio of........................ 26.22% agreeing identically with the ratio established if the company had been adjudicated bankrupt and the controversies entirely adjudicated in favor of the trustee, without taking into consideration any expenses of litigation to accomplish that result.

In other words, it is now claimed on the record by the petitioning creditors in the bankruptcy proceeding that, as a result of the bank settlement agreements, equally advantageous benefits have been secured for the unsecured creditors as would have resulted if the company had been adjudicated bank-

rupt and pursuant thereto litigation to set aside the bank preferences had resulted entirely favorably to the trustee in bankruptcy. Furthermore, any possible equity for the stockholders was salvaged. The advantage of the increased probabilities of possible reorganization of Middle West Utilities Company by avoiding bankruptcy and pursuing pending reorganization efforts will be readily admitted.

It cannot be denied that this trust has been well administered. A comparison of the most recent twelve-month period for which data is available under the operation by the receiver with twelve months immediately prior to receivership shows a reduction in controllable expenses of over $6,000,000. Notwithstanding a reduction of some $13,000,000 in gross operating revenues, the receiver produced a lower operating ratio of expenses to operating revenues. The Chicago office expenses of the company for the year 1931 amounted to $2,006,146, while for the year 1933 under the administration of the receiver they amounted to $596,820. For the year ended March 31, 1932, the gross operating revenues of the company for the properties which are now a part of the system were $77,071,460; for the year ended November, 1933, they amounted to only $63,705,801, or a decrease of $13,365,659. The operating expenses for the year ended March 31, 1932, were $35,984,326, while for the year ended November 30, 1933, they were $29,617,544, or a decrease of $6,366,782, or approximately 50 per cent. of the decrease in gross revenues. Very substantial decreases in expenses all along the line have been made under the administration of the receiver; tremendous savings have been effected by him; the cash position of the company and its subsidiaries have been very materially improved. All this has been accomplished during a period of unprecedented depression in business generally. These results speak for themselves. The court should certainly hesitate to discharge a receiver who has performed his duties as Mr. McCulloch has in this case, in conserving the property and producing a situation where it is now possible to consider reorganization.

The charge is made that the bankruptcy proceedings against Middle West were not filed in good faith. The court finds no support for that allegation in the proof. While on April 15, 1932, the court entered an order enjoining all suits or proceedings by individual creditors for their individual benefit against the company, no restraining order has at any time been entered or any move made to that end by the equity receivers or others to prevent any claimants or general creditors initiating or prosecuting any actions in bankruptcy, or intervening in any bankruptcy proceeding for their protection, or from recovering any assets or property for the benefit of general creditors from banks or others. The equity receivers cooperated with petitioning creditors in bankruptcy to the extent of supplying, whenever requested, audits and data thought to have any bearing in the efforts to recover assets belonging to the trust or for the benefit of its stockholders or general creditors. The bankruptcy proceeding is now pending in the Circuit Court of Appeals on appeal entered March 15, 1933, by the District Court, refusing to strike portions of the original and amended petition and directing that acts of bankruptcy relied on be specified. It appears that the filing of the bankruptcy petition on April 15, 1932, has probably proved to be an effective aid in recovering from certain commercial and investment banking institutions substantial assets and property for the benefit of the trust, which should be of material assistance in making possible and expediting a reorganization of the company.

No one has claimed that a receivership for Middle West was unnecessary. It cannot be denied that the receivers have discharged the responsibilities of their trust with fidelity and integrity and with signal advantage and benefit to the trust estate. There is no charge or claim that the jurisdiction of this court to appoint receivers for Middle West did not obtain or exist. It is admitted by all parties interested that the petition for the appointment of receivers was sufficient to invoke the jurisdiction of this court, and that it was proper that such a petition should have been filed. It is admitted that the court had inherent jurisdiction in this case. It is admitted that the court should have appointed receivers. There is no charge that fraud was used to create a case to confer jurisdiction in this court to act and appoint receivers for the Middle West. Charles A. McCulloch, now sole receiver, was not at the time of his appointment, has not been at any time since then, and is not now, disqualified from acting as receiver herein. Counsel for receiver were not at the time of their appointment, and since their appointment, have not been, and are not now, disqualified.

I conclude, therefore, that it is my duty as a chancellor to continue the present administration of the trust. It seems to me

beyond doubt that the accomplishments to date have been promotive of the best interests of the estate and the beneficiaries therein.

I have set out the facts in considerable detail and therefore, in accordance with rule in equity 70½ (28 USCA § 723), I adopt the foregoing as my findings of fact and conclusions of law.